Filed 6/17/15  In re E.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E062769 |
| Plaintiff and Respondent, | (Super.Ct.No. J205929) |
| v. | OPINION |
| E.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

Defendant and appellant, E.C. (mother) is the mother of two sets of twins; J1 and J2 (now 11 years old), and E1 and E2 (now nine years old). The children were initially removed due to allegations of severe physical abuse. Mother and father were offered reunification services and were eventually able to regain custody of J1, J2, and E1. The court terminated mother's parental rights as to E2. E2 is the subject of this appeal.

On appeal, mother contends that the juvenile court erred in finding E2 adoptable. For the reasons set forth *post*, we shall affirm the court's finding of adoptability.

II

STATEMENT OF THE CASE AND FACTS

E2 and his siblings came to the attention of plaintiff and respondent San Bernardino County Children and Family Services[1] (CFS) on January 14, 2006, after E2 was admitted to Loma Linda University Medical Center with severe nonaccidental injuries. E2 was five months old at the time. Initial tests indicated that E2 had sustained multiple tibia fractures in both legs, several fractured ribs, and a fractured humerus, all at various stages of recovery.

When asked about the injuries, mother reported that E2's siblings would routinely abuse him. They pulled E2's legs through the crib, poked his eyes, and pushed him off the sofa. Mother also stated that the older siblings would pick up E2 and then drop him

_____

[1] Formerly, the San Bernardino County Department of Children's Services.

to the floor. The doctors at the Children's Assessment Center, however, concluded that E2's injuries were nonaccidental and could not have been caused by his two-year-old siblings. The reporting doctor noted that a two year old could not cause such severe fractures and the location of the rib fractures were indicative of an adult grasping the child and pushing on the ribs.

Mother and father had a long history of domestic violence. At the time of detention, father was incarcerated for felony battery and corporal injury on a spouse. Mother reported that father's domestic violence problems were related to his methamphetamine use.

On January 20, 2006, CFS prepared petitions under Welfare and Institutions Code section 300.[2] As to E2, the petition alleged serious physical harm under section 300, subdivision (a); failure to thrive under section 300, subdivision (b); and severe physical abuse under section 300, subdivision (e).

The social worker filed a detention report indicating that the siblings were removed from mother's care while E2 remained in the hospital. The medical investigation had not been completed and all three siblings were set to be evaluated by the Children's Assessment Center to rule out hidden injuries.

At a detention hearing on January 23, 2006, the juvenile court found a prima facie case to detain the children and ordered weekly visitation.

---

[2] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

The social worker filed a jurisdiction/disposition report dated February 14, 2006, recommending that the children be detained with the maternal grandfather and his spouse, Ms. R. E2 had recently been discharged from the hospital and placed with his siblings in the maternal grandfather's home. The social worker reported that the children appeared happy in the placement and were adjusting well.

The jurisdiction/disposition hearing was continued to allow time to transport father and, on March 17, 2006, the social worker filed an addendum report recommending continued placement in the maternal grandfather's home.

When interviewed about E2's injuries, mother denied that she had done anything to harm him. Mother continued to blame E2's injuries on the older siblings. The social worker did observe that J1 and J2 were very active, and required constant supervision.

On March 30, 2006, a contested jurisdiction/disposition hearing was held. Mother and father offered no affirmative evidence and submitted as to jurisdiction. The court sustained the petition and declared the children dependents of the court. The court found father to be the presumed father of the children. The court then ordered reunification services and visitation, and ordered the parents to participate.

The social worker's status review report recommended that E2's three siblings be returned to mother's care but that E2 remain in placement with continued services. The social worker characterized the prognosis for reunification as guarded because mother was still learning how to parent all of the children with minimal support in the home. However, mother was attending counseling, and visitations were going well.

4

E2 was doing well in his placement with maternal grandfather. He had gained a significant amount of weight and was catching up developmentally.

On October 31, 2006, the court held the six-month review hearing. The court found that it remained detrimental to return E2 to mother's custody. The court ordered continued reunification services for both parents.

On April 16, 2007, the court approved the social worker's recommendation requesting liberalized visitation, including unsupervised visits as to E2.

In the 12-month status review filed on April 20, 2007, the social worker recommended that E2 remain in his placement, and that services be continued as to the parents. Both parents were making substantial progress in their case plan and were visiting E2 frequently. E2 had learned to walk and was now running a lot. His gross motor skills were improving with therapy, but his speech was slow.

The social worker's report indicated that the parents acknowledged that if E2 were to be returned, it would be a transitioning process beginning with unsupervised visits and progressing from there.

On October 24, 2007, the court approved the social worker's recommendation requesting liberalized visitation to include unsupervised weekend and holiday visits as to E2.

In the 18-month status review report filed on December 11, 2007, the social worker recommended that the dependency be dismissed as to E2's siblings, but requested that the dependency be continued as to E2. The social worker reported that unsupervised weekend visitation had not gone well. E2 again sustained injuries that the parents

attributed to the older siblings. During the first overnight visit, E2 burned his hand on a light bulb causing blisters on two fingers. After the second visit, E2 returned with a bite mark on his cheek, and a swollen and bruised eye.

Notwithstanding these injuries, both parents continued to participate in counseling and father was participating in his domestic violence classes. The social worker noted that the parents needed to continue working on transitioning E2 back into the home and providing strong supervision over the children to maintain their safety.

E2 was doing very well under the care of the maternal grandfather and Ms. R. His developmental skills were age appropriate and he was catching up in his speech. The maternal grandparents were very bonded with E2 and interested in continuing to provide E2's care.

In an addendum report filed on January 25, 2008, the social worker initially recommended that E2 be returned to the care of his parents under a family maintenance plan. Visitation had been going well and E2 had not sustained any injuries over the previous month. However, E2 soon sustained additional injuries while in mother's care and the social worker changed her recommendation to guardianship for E2. During one visit, E2 received a bloody nose which the parents claimed occurred when E2 unsuccessfully tried to crawl onto the parents' bed in the middle of the night. After another visit, E2 returned with burn marks on his eyelid and left side of his nose. The parents claimed that they did not notice the burns and speculated that E2 may have burnt himself while eating hot food, or may have been injured when he fell over some steps.

In the interim, maternal grandfather requested de facto parent status and submitted a letter indicating that he wanted to be considered for adoption if that became necessary, and that his "ex-mother in law" was also interested in adoption.

On May 22, 2008, the juvenile court held a section 366.22 hearing. The court found that custody by the parents continued to be detrimental to E2's welfare and found that the parents had failed to complete the court-ordered treatment plan. The court terminated reunification services and set a section 366.26 hearing to select a permanent plan for E2.

On July 9, 2008, the social worker filed a section 366.26 report recommending that the maternal grandfather and Ms. R. be appointed as legal guardians. The social worker reported that grandfather and Ms. R. were financially able to care for E2 and wanted to provide a loving and stable home for him. Maternal grandfather stated that he would be willing to adopt E2 in the future if it ever became an option. E2 initially had scored low on his developmental scores and had been labeled developmentally delayed. However, at almost three years of age, he had overcome those delays and was developmentally on target for his age. As of September 20, 2007, his occupational evaluation scores had increased to age level and the Early Start Program recommended that E2 be dismissed early from the program.

Neither mother nor father attended the section 366.26 hearing. The juvenile court followed the recommended findings and orders. The court found that termination of parental rights would be detrimental to E2's interests and found that legal guardianship was the appropriate permanent plan. The court appointed maternal grandfather and Ms.

7

R. as legal guardians, ordered continued supervised visitation with the parents for a minimum of one hour per week, and dismissed the dependency.

Three years later, on June 15, 2011, mother filed a section 388 petition requesting increased visitation and a new home review. The petition was summarily denied for failure to state new evidence or a change in circumstances.

Two years after the summary denial of mother's petition, several parties began to file additional section 388 petitions. On July 8, 2013, father filed a petition requesting reunification services and unsupervised visitation. Mother filed three more petitions requesting that the guardianship be terminated and that E2 be returned to her home. Mother also requested increased visitation and wrote that the one-hour visits did not give E2 an opportunity to form a meaningful bond with her. Mother made a variety of allegations concerning maternal grandfather's care of E2, which the department investigated and ultimately determined were unsubstantiated. CFS records reflected that between January 2010 and August 2012, the parents had 10 child abuse referrals alleging neglect, emotional abuse, and caretaker incapacity in regard to E2's siblings. The social worker noted that in 2012, mother was detained on a 72-hour psychiatric hold under section 5150. The social worker also discovered that the police had been involved in several domestic abuse complaints at mother's residence because she and father were fighting in front of the children.

Maternal grandfather also filed a section 388 petition; he requested that the guardianship be changed to adoption. He alleged that the parents continued to engage in

domestic violence and drug use, and requested adoption as a means of providing stability for E2.

The social worker prepared a response to maternal grandfather's section 388 petition. She recommended that the permanent plan of guardianship should be modified and that a new section 366.26 hearing be set to establish a permanent plan of adoption for E2. The social worker reported that E2, now seven years old, had spent nearly his entire life with the guardians and was closely bonded to them. When E2 was asked about staying with his parents, he responded that he would like to visit sometimes, but he did not want to spend the night with them.

The six section 388 petitions were eventually mediated and all parties agreed to drop the petitions. The mediation agreement also included family therapy and weekly visitation at the CFS visitation center. On October 29, 2013, the court reinstated the dependency and all parties formally withdrew their petitions. The court ordered visitation and set a review hearing for six months.

In a status report filed on April 22, 2014, for the section 366.3 post-permanent plan review hearing, the social worker recommended that a new section 366.26 hearing be set to change the permanent plan to adoption. Mother and father still had not established a stable home. They had recently separated which caused stress in the home. E2 appeared to be developing an attitude of resentment toward the parents due to the stress and uncertainty of the dependency proceedings. According to the grandparents, E2 would frequently beg not to attend visits and the social worker observed him saying "please don't make me go" when the visits were mentioned. Once the visits began,

9

however, E2 appeared to enjoy himself.  However, once the visits ended, E2 generally went directly to maternal grandfather and asked to leave.

The juvenile court found that the guardianship was no longer appropriate and that it was in E2's best interests to consider termination of parental rights.

In the section 366.26 report filed on September 30, 2014, the social worker recommended that parental rights be terminated and a permanent plan of adoption be implemented.  The maternal grandfather's home had been assessed and approved for placement on November 22, 2013, by the relative approval unit.  The adoptability assessment indicated that E2 was a healthy nine-year-old boy with no medical concerns.  E2 enjoyed swimming, playing video games, and taking trips with his prospective adoptive parents.  E2 stated that he wanted to stay with his maternal grandfather and Ms. R.  He referred to them as mommy and daddy.  E2's therapist noted that E2 had a close relationship with his grandfather, whom he considers his father.

The social worker reported that after the parents initiated proceedings to have E2 returned to their care, he started displaying very anxious behavior and refused to sleep in his bedroom alone.  E2 expressed concern about the court proceedings and was worried that he had done something wrong to cause the court's involvement.  E2 indicated that he did not mind visiting his siblings but he was fearful of having to leave his adoptive home.

The social worker found that E2 was appropriate for adoption, and recommended that he be freed from his birth parents in order to be placed for adoption with his prospective adoptive parents.  The adoptive parents had been awarded guardianship in July 2008, and E2 had spent nearly his entire life in their home.  E2 would seek out the

adoptive parents for affection and appeared very comfortable in their home. For fun, the family enjoyed a family vacation every year, and weekend trips to Disneyland or Knott's Berry Farm. E2 had a sweater collection from Disneyland, one for every year since 2008. The adoptive parents appeared to enjoy parenting E2 and were committed to doing whatever was necessary to ensure E2's well-being. The adoptive parents stated that they had tremendous love for E2 and were committed to raising him in a stable home.

At the section 366.26 hearing, mother testified that E2 sometimes drew her pictures and that she believed he wanted to spend more time with her. On cross-examination, mother stated that E2 called her "mama" but was actually confused about who she was. In closing argument, counsel for CFS pointed out that, even if E2 recognized mother as his biological mother, the caretakers had been E2's parents; it would be devastating to E2 if his relationship with his caretakers were jeopardized. Mother's counsel argued that there was a bond between mother and E2, and asked the court to maintain the guardianship rather than terminate her parental rights. Mother's counsel never addressed E2's adoptability.

The juvenile court found that E2 was adoptable. It stated, "The court believes that there is no question—in fact, there has not been any contrary evidence presented—that [E2] is both specifically and generally adoptable." The court continued, "So there's no issue about that. No testimony or no evidence has been submitted to the contrary." The court found by clear and convincing evidence that E2 was likely to be adopted and that the adoption was likely to be finalized by December 7, 2015. The court concluded that its orders were in E2's best interest and terminated mother's parental rights.

11

On January 26, 2015, mother filed her notice of appeal. On appeal, mother claims that the trial court erred in terminating her parental rights. For the reasons set forth *post*, we shall affirm the trial court's order.

III

ANALYSIS

Mother's sole contention on appeal is that the court erred in finding E2 adoptable because the court failed to consider the possibility that the adoptive home might not pass a home study. We disagree.

The juvenile court cannot terminate parental rights unless it finds by clear and convincing evidence "that it is likely the child will be adopted. . . ." (§ 366.26, subd. (c)(1).) The focus of the adoptability inquiry is on the child, "and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family. [Citations.]" (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400; see also *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) A proposed adoptive parent need not be identified and ready to adopt, but "there must be convincing evidence of the likelihood that adoption will take place within a reasonable time. [Citation.]" (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292 [Fourth Dist., Div. Two].)

""""Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and

12

other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*."' [Citation.]" (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562; see also *In re I.W.* (2009) 180 Cal.App.4th 1517, 1526.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child[ren] [were] likely to be adopted within a reasonable time." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) It is the parent's "'burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order.' [Citation.]" (*In re Jose C.* (2010) 188 Cal.App.4th 147, 158.) "In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

In her opening brief, mother contends that "[i]t was not assessed whether the grandfather would be able to provide safe and adequate care for [E2] . . . given his medical issues, and reported daily use of opiates." We disagree with mother's contention. The prospective adoptive parents have cared for E2 his entire life without any problems or issues. Moreover, the social worker provided a thorough assessment of the prospective adoptive parents before recommending adoption as the permanent plan. Furthermore, the suitability of adoptive parents or a caretaker's disability is not relevant to an adoptability finding. (Welf. & Inst. Code, § 366.26, subd. (c)(1); Fam. Code,

13

§§ 8601, 8602, 8603.) Notwithstanding, mother fails to address this in her reply brief. Instead, mother simply focuses on the prospective adoptive parent's health problem.

In this case, E2 was already in a stable placement and there was more than substantial evidence that he was adoptable. As stated in detail *ante*, after E2 was released from Loma Linda University Medical Center in 2006, he was placed in the maternal grandfather's home. He has remained there ever since. As early as July 2008, maternal grandfather indicated that he would be willing to adopt E2 in the future if it ever became an option. E2 stated that he wanted to stay with his prospective adoptive parents, whom he called mommy and daddy. E2's therapist noted that E2 had a close relationship with his grandfather, whom he considered his father. E2 would seek out the adoptive parents for affection and was very comfortable in their home since he lived there most of his life. The grandparents were committed to doing whatever was necessary to ensure E2's well-being and were committed to raising him in a stable home.

Contrary to the grandparents, after nine years of CFS involvement, mother and father still did not have a stable home and had recently separated. E2 would frequently beg to skip visits with mother. The social worker observed E2 saying, "please don't make me go" when the visits were mentioned. Between January 2010 and August 2012, the parents had 10 child abuse referrals alleging neglect, emotional abuse, and caretaker incapacity with regard to E2's siblings. In 2012, mother was detained on a 72-hour psychiatric hold under section 5150. Moreover, there had been several instances of domestic abuse in mother's home.

14

Furthermore, despite mother's arguments to the contrary, the adoptive home had already been assessed and approved for placement on November 22, 2013, by the relative approval unit. The prospective adoptive parents were financially able to care for E2 and wanted to provide a loving and stable home for him. The social worker's section 366.26 report contained an extensive adoptability assessment and that report was received into evidence at the section 366.26 hearing. The court expressly found that E2 was adoptable. It stated, "The court believes that there is no question—in fact, there has not been any contrary evidence presented—that [E2] is both specifically and generally adoptable. . . . So there's no issue about that. No testimony or no evidence has been submitted to the contrary." In her reply brief, however, mother attempts to cloud the issues by listing specific factual findings that the adoptability finding lacked. Mother, however, fails to understand the substantial evidence standard of review. Under the substantial evidence standard of review, "[i]n the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination." (*Constance K. v. Superior Court*, *supra*, 61 Cal.App.4th at p. 705.)

In support of her claim on appeal, mother also relies on *In re Jerome D.* (2000) 84 Cal.App.4th 1200 (*Jerome D.*). In that case, the minor was removed from his mother's care and placed with the mother's ex-boyfriend, Mr. E. Mr. E. had three prior criminal convictions for domestic violence, and at the time of the dependency proceedings, he was being criminally prosecuted for a fourth charge. Mr. E. was also listed as a perpetrator with Child Protective Services for emotionally abusing his niece and nephews. (*Id.* at pp. 1203-1204.) The court terminated the mother's parental rights and found the minor

15

adoptable based on Mr. E.'s willingness to adopt him. The appellate court reversed, finding that there was a failure to address the minor's medical issues with his prosthetic eye and his close relationship with his mother. The court found that Mr. E.'s willingness to adopt was insufficient to support a finding of adoptability because the court failed to address his prior history with Child Protective Services and his criminal convictions. (*Id.* at p. 1205.)

*Jerome D.* is distinguishable. In this case, there is no evidence that the caretakers had any criminal history, prior CFS history, or any other issues that would prevent them from adopting E2. The social worker reported that the prospective adoptive parents did not have any criminal history or history of CFS involvement. Moreover, the prospective adoptive parents had been in a stable marriage for 28 years and were committed to providing a safe and loving home for E2. E2 had been living in this home for almost his entire life and the prospective adoptive parents have loved, nurtured and taken care of E2 with no issues. Furthermore, unlike the child in *Jerome D.*, E2 did not have a significant parent-child bond with mother. Mother even admitted that visiting for one hour per week did not provide enough time to form a meaningful bond with E2. E2 also indicated that he did not mind visiting his siblings but was fearful of having to leave his adoptive home. He called his prospective adoptive parents mom and dad. It is important to note that E2 was raised nearly his entire life in the adoptive home and regarded his caregivers as his parents. The change in permanent plan did not involve a new placement. Maternal grandfather had consistently expressed an interest in adopting E2 and requested the change in the permanent placement plan from guardianship to adoption. Moreover, as

16

provided above, the focus of the adoptability inquiry is on the child, "and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family. [Citations.]" (*In re Erik P.*, *supra*, 104 Cal.App.4th at p. 400; see also *In re Sarah M.*, *supra*, 22 Cal.App.4th 1642, 1649.) In this case, there is nothing to indicate and mother has failed to show that E2's age, physical condition, and emotional state would make it difficult to find him an adoptive home.

Based on the above, we find that substantial evidence supports the juvenile court's finding that E2 was adoptable.

IV

DISPOSITION

The juvenile court's order terminating the parental rights of mother is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

17